UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY CRUMP,

        Plaintiff,

    v.

BAY AREA RAPID TRANSIT DISTRICT, et al.,

        Defendants.

Case No. 17-cv-02259-JCS

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MODIFYING FILING DEADLINES IN SECTION V OF PRETRIAL ORDER (DOCKET NO. 41)**

Re: Dkt. No. 50

## I.  INTRODUCTION

Plaintiff Anthony Crump asserts civil rights claims against the Bay Area Rapid Transit District ("BART") and BART police officers Hashmat Bahaduri and Jason House[1] based on an incident that occurred at the Concord BART station on October 23, 2016.  Presently before the Court is Defendants' Motion for Summary Judgment ("Motion").  A hearing on the Motion was held on October 5, 2018.  For the reasons stated below, the Motion is GRANTED in part and DENIED in part.[2]  The Court also modifies certain deadlines for filing pretrial materials, as set forth in the Conclusion section of this Order.

## II.  BACKGROUND

### A.  Factual Background

Mr. Crump's description of his encounter with Officer's Bahaduri and House is as follows:

---

[1] Officer Tanya Salas is also named in the body of the First Amended Complaint, though Officer Salas was not listed in the caption of that complaint.  Officer Salas is the Internal Affairs officer who took Mr. Crump's post-incident statement.  Mr. Crump has stipulated, however, that he is not asserting any claims against Officer Salas.

[2] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

1) I am the plaintiff herein.

2) This incident happened on October 23, 2016, at the Concord BART Station.

3) Earlier that day, I rode BART into Concord so that I could volunteer with these people who grow roses for special occasions like Mother's Day. The people were friends of my deceased godmother and I had been working with them since about 2008.

4) In 2016, I had been volunteering one day a week every week or two.

5) The people pick me up when I arrive, and they drop me back off at the Concord BART Station in the evening after I finish working in their garden.

6) On October 23, 2016, I arrived at the Concord BART Station at about 11:30 P.M. for the Return trip.

7) I am careful so as [not] to miss the last train because if I miss the last train, BART stops running and they shut down the Station and the police make everyone leave the area.

8) Once it closes for the evening the BART Station does not reopen until the next morning so if I miss the last train I could be stuck in Concord in the cold until morning.

9) That has happened to me once before and I was careful to try not to let that happen again.

10) I walked to the bicycle rack and unlocked and removed my bicycle and walked it about 30 feet to the bench so I could pack my bicycle for the journey back into Berkeley, California where I was living at the time.

11) I placed my hedge trimmers on the bench next to my tool bag and was in the process of re-attaching my seat. I remove my seat to prevent people from stealing it.

12) I was not engaged in any behavior that one might suspect to be criminal and I was taking my time packing my bicycle.

13) I had been doing this exact ritual for many years and the police had never before detained me.

14) The first BART officer to approach me was Officer Hashmat Bahaduri.

15) He approached me and shined his light on my garden sheers and me.

16) I asked him if I he wanted to see me unlock my locks.

17) He said he did. So I unlocked and relocked locks.

18) I have two locks, one for the front wheel and the other for the back wheel.

19) Then Officer Bahaduri asked me if those were bolt cutters on the bench.

20) Bolt cutters and hedge trimmers look nothing alike and he had his flashlight beaming on the hedge trimmers.

21) As a trained professional he should have known the difference between hedge trimmers and bolt cutters.

22) Then I heard Officer Bahaduri radio in and it sounded to me like he said that he was detaining a suspected bike thief.

23) I told Officer Bahaduri that the bicycle belonged to me.

24) I told him that I had not done anything wrong and that I would sue him.[3]

25) I also told him that I was in a hurry to catch the last BART train and that I did not want to miss the last train out of Concord.

---

[3] Defendants ask the Court to strike paragraph 24 on the basis that it is contradicted by the video evidence and thus a sham affidavit with respect to this paragraph. Reply at 3. They also point out that a party cannot create a material dispute of fact to defeat summary judgment by making statements that contradict the party's own past testimony. *Id.* According to Defendants, in paragraph 24 of his declaration, "Plaintiff claims he told Bahaduri 'I had not done anything wrong and that I would sue him' in response to Bahaduri's radio transmission about detaining a possible bike thief" but that "this is incorrect" because "Plaintiff never made that statement." *Id.* Further, Defendants assert, Mr. Crump testified at his deposition that he told Bahaduri "Don't try nothing funny" and said "I'm going to go in my pocket and get this key lock out, and I'm going to unlock to show you it's my bike." *Id.* (quoting Downs Decl., Ex. A (Crump Dep.) at 48). The Court DENIES Defendants' request to strike this paragraph. Defendants' reading of this paragraph is overly narrow. Mr. Crump does not place the words in paragraph 24 in quotation marks, indicating that the statement was not intended to be an exact quote of what he said. Nor does he state that he said these things immediately upon hearing Officer Bahaduri call for back-up and refer to a possible bike theft. Rather, paragraph 24 is not limited to that particular point in the encounter. Drawing all reasonable inferences in Mr. Crump's favor, his statement in paragraph 24 is consistent with the video footage, discussed below, which shows Mr. Crump telling the officers he planned to sue them and also telling them repeatedly (using a variety of phrases) that the bike was his and he wasn't stealing anything. The Court notes that Defendants object to a number of other paragraphs in Mr. Crump's statement on the basis that they are irrelevant, speculative or factually incorrect. *See id.* at 3-4. The Court addresses these objections only to the extent the statements in these paragraphs are relevant to its analysis.

26) Then Officer Bahaduri commanded me to unlock and relock both of my locks again because he claimed he did not see me when I did that for him the first time.

27) Ultimately, I unlocked and relocked both locks four times.

28) Officer John House arrived about two minutes later.

29) When Officer House arrived, I picked up the hedge trimmers and demonstrated for both officers that the hedge trimmers were not bolt cutters.

30) I was loudly explaining that to the officers while I was motioning with the hedge trimmers to show them that they were not bolt cutters.

31) I was not threatening them at all; however, as soon as I picked up the hedge trimmers and began my demonstration both officers drew their weapons on me.

32) Officer House says that he drew his taser and pointed it at the ground in front of me.

33) Officer Bahaduri says that he drew his firearm and pointed at the ground in front of me.

34) To me it appeared that they reached for their waist area and drew firearms and point them at my face.

35) Regardless, I know guns are dangerous and I was frightened because I know that bullets may ricochet.

36) It happened really quickly, and I remembered that it was a BART officer who claimed he was grabbing for his taser when he shot the young man, Oscar Grant.

37) Both officers told me to put down the hedge trimmers or they would shoot me.

38) I carefully set them down on the ground and backed away from the hedge

39) Then I moved towards the bench behind me.

4

40) Both officers rushed me and grabbed my thumbs.

41) One officer grabbed my right thumb and the other officer grabbed my left.

42) They twisted my thumbs and wrenched my wrists above my shoulders and I could hear a popping sound. They tore both of my rotator cuffs and I later had repair surgery.

43) Then they placed me in handcuffs and sat me back down on the bench.

44) For the next 15-20 minutes while I was in handcuffs they attempted to downplay their actions in wrongfully detaining me and to justify why they used force on me.

45) I had not done anything to justify being detained, or handcuffed.

46) I learned later that the officers had used so much force that they tore my rotator cuffs, and I had to have surgery to repair both sides.

47) I also suffer from schizophrenia and the officers were placing extraordinary stress on me by pointing their weapons at me and by wrenching my arms out of place.

48) Even though I was cursing at the officers for violating my Constitutional rights I fully cooperated with them and followed all of their commands.

Crump Decl., ¶¶ 1-48.

Officers Bahaduri and House both had their body cameras on during the encounter with Mr. Crump. *See* Amended Declaration by Philip. J. Downs in Support of Defendants' Motion for Summary Judgment, or Adjudication ("Downs Decl."), Exs. B & C. The body camera footage of the officers is consistent with many aspects of Mr. Crump's account, though it does not show either officer drawing a firearm, as discussed further below. Officer Bahaduri's body camera footage starts with Officer Bahaduri shining a flashlight on Mr. Crump, apparently from inside the BART station through a window. Downs Decl., Ex. B (Bahaduri body camera footage). Officer Bahaduri then walks outside the station and approaches Mr. Crump, shining his flashlight on Mr. Crump again, who is standing next to a bicycle, and the bench opposite the bicycle. A tool bag[4]

---

[4] Officer Bahaduri testified at his deposition that he believed from the outset that the bag was a tool bag because it had "obvious tool bag logos or brands on it." Downs Decl., Ex. E (Bahaduri Dep.) at 23. He further testified that he didn't know if there were any tools in the tool bag until later in the encounter, when he "actually looked." *Id.*

and gardening shears can be seen on the bench.   As he approaches, Mr. Crump asks, "didn't you just see me unlock this bike?"   Officer Bahaduri responds, "no I didn't" and then Officer Bahaduri can be heard calling for backup regarding an individual "possibly stealing a bike." *Id.* In the meantime, Mr. Crump is unlocking one of the u-locks on his bike and holding it up to Officer Bahaduri, saying "you see that? It's mine." Officer Bahaduri then shines his flashlight on the bench again, which is a few feet away from Mr. Crump; Officer Bahaduri says, "what is that, a bolt cutter?"[5] Mr. Crump responds, "it's a hedge trimmer man, what the f*** you talking about? Where you from, Tucson?" Officer Bahaduri asks Mr. Crump why he is "yelling" and Mr. Crump tells him he is "trying to make the last train" and that Officer Bahaduri is wasting his time, continuing, "I just unlocked it." *Id.* Officer Bahaduri asks Mr. Crump if he can "see [him] do that one more time" because he was "focused on the tools." *Id.* Mr. Crump complies and opens a second u-lock as well, holding the lock up to the Officer and saying, "that should tell your ass it's mine" and asking if he can catch his train. Officer Bahaduri instead asks Mr. Crump to unlock the second lock again.  Mr. Crump objects, saying, "I already unlocked that thing, I ain't gonna unlock that mother-f***** no more."  Officer Bahaduri says, "okay, then you'll be detained."  Mr. Crump says, "detained?  I just unlocked the mother-f*****" and proceeds to unlock the second lock again.   As he is doing so, he says, "you better call for back-up, bitch, cause you gonna need it."  Officer Bahaduri responds, "I already did" and continued, "it's gonna be bad for you, the way you acting."[6] Mr. Crump answers, "hey f*** that man, you detaining me, I just unlocked both my damn locks and I'm telling you it's my goddam bike."  At this point Mr. Crump holds up the lock again and Officer Bahaduri says, "alright, you have a good night."  Officer Bahaduri then turns away from Mr. Crump, who can no longer be seen, and Mr. Crump can be heard responding, "you have a f***** up night."

Within seconds of this exchange Mr. Crump reappears in the footage and can be seen

---

[5] Defendants stipulated at oral argument that no bolt cutter was found in the area at any time during or after the encounter and that what Officer Bahaduri thought may have been a bolt cutter was, in fact, a pair of gardening shears.
[6] In his deposition, Officer Bahaduri testified that he was "scared" by Mr. Crump's "threats" at this point.  Downs Decl., Ex. E (Bahaduri Dep.) at 37.

picking up the gardening shears, turning towards Officer Bahaduri and taking two or three steps forward while opening and shutting them, saying "they're not no bolt cutters, they're hedge trimmers." At this point, Officer Bahaduri raises his voice, saying "don't bring that around me" and "you're gonna get shot." Officer House's voice can also be heard at this point, saying "put them down." Neither officer can be seen in the footage and, as Defendants' expert has opined, the video footage is "inconclusive as to whether either officer actually withdrew his sidearm from the holster at any time." Downs Decl., Ex. H (Schott Report). Mr. Crump does not approach the officers after these commands and drops the gardening shears. He says, "I don't believe this shit" and Officer Bahaduri then says, "you know what, have a seat."[7] At this point, the officers place handcuffs on Mr. Crump, who does not resist, though he continues to protest the officers' actions, saying he unlocked his locks "four times just to show [them]" that the bicycle belonged to him.[8]

While Mr. Crump sits on a bench, handcuffed, Officer Bahaduri asks for identification. Mr. Crump tells him his id. is in his wallet in his pocket but says, "you can't go in there in my pocket and get my wallet." He tells Officer Bahaduri his name and also says he is going to sue the officers for harassment because he already showed them that the bicycle was his. Officer Bahaduri asks Mr. Crump for his birth date, which Mr. Crump provides.

The exchange between Mr. Crump and Officer Bahaduri about the reason for Mr. Crump's detention continues, with Officer Bahaduri saying "you pulled out the hedge trimmers," and Mr. Crump responding that they were already out and that he "gotta put it on my bike to leave." Officer Bahaduri counters, "you grabbed them and pointed them at me" and Mr. Crump says, "oh

---

[7] In his deposition, Mr. Crump recalled saying, "Man, don't shoot me in my face over my own bicycle." Downs Decl., Ex. A (Crump Dep.) at 53. Similarly, in his statement to the BART public affairs officer made soon after the incident Mr. Crump said that he had said, "Don't shoot me over my own bike." Downs Decl., Ex. F at 2. However, no such statements can be heard on the body camera footage of Officers Bahaduri and House.

[8] At his deposition, Mr. Crump also testified that he "yelled in pain" and complained loudly to the officers when they placed the handcuffs on him, telling them they were hurting him. Downs Decl., Ex. A (Crump Dep.) at 83-84. He conceded that the body camera footage does not show him yelling or making any complaints about the handcuffs hurting him and asserted that the video footage must have been tampered with. *Id.* The Court rejected Mr. Crump's allegation that the video footage was tampered with when it denied Plaintiff's motion to disqualify Defendants' counsel, finding no evidence to support that allegation. *See* Docket No. 44. At oral argument, Plaintiff stipulated that he has no evidence that the body camera footage offered by Defendants in support of their summary judgment motion has been tampered with.

man, I was showing you they're hedge trimmers, you jackass, not no bolt cutters."  Officer

Bahaduri says, "see, it's your attitude."  Later in the conversation, Mr. Crump can be seen telling

Officer House that his "shit gets stolen all the time" and Officer House responds, "that's why

we're detaining you, because stuff gets stolen out here."  Officer House says, "if you'd just

cooperate the investigation would go so much faster."  Mr. Crump says, "I *did* cooperate" and

points out that he had unlocked his locks as he had been asked to.

After several more minutes of back and forth between Mr. Crump and the officers, Officer

Bahaduri tells Mr. Crump that he has to "make sure that [Mr. Crump] is not a danger to society

because of the way [he was] acting."  Mr. Crump laughs and says, "I might be a menace to society

because I'm black, huh?"  Officer Bahaduri says he used the word "danger" and Mr. Crump says,

"you said menace" to which Officer Bahaduri says, "you're instigating right now, sir."  Officer

Bahaduri then asks, "if I released you, do you want to hurt anybody?"  Mr. Crump says, "I didn't

want to hurt nobody from the start, I was minding my own business."  Officer Bahaduri asks, "do

you want to hurt me?" and Mr. Crump says, "I didn't even know who the f**** you were, I hadn't

even met you."  Officer Bahaduri asks, "are you diagnosed with any mental conditions" and Mr.

Crump says, "no man, what is this?"[9] Officer Bahaduri goes on to ask Mr. Crump a series of

questions about his work and why he needs hedge trimmers, telling Mr. Crump that he is trying to

determine whether the tools he has with him are burglary tools.   Officer House joins in the

conversation, telling Mr. Crump that Officer Bahaduri is trying to determine if he has the tools for

a "legitimate reason, such as a job" or if he was using them to "steal bike parts."  Mr. Crump

reiterates that his bag contains tools for his job and then one of the officers' hands can be seen

opening Mr. Crumps bag and taking things out.  In response to Mr. Crump's continued

complaints, Officer Bahaduri tells him that he doesn't know if Mr. Crump "threw a cable lock in a

garbage can" or "hid it back there" and that he doesn't know if "that's your bike."

Then followed a lengthy discussion between the officers and Mr. Crump about whether or

---

[9] While Mr. Crump told the officers he was not diagnosed with any mental conditions, he testified
at his deposition that he had been diagnosed with "paranoia" in 2003.  Downs Decl., Ex. A
(Crump Dep.) at 26.  In his declaration in support of his opposition brief, Mr. Crump also states
that he suffers from schizophrenia, as noted above.  Crump Decl. ¶47.

not the officers' detention of Mr. Crump was justified. At one point, Mr. Crump says that the officers detained him because he was black and Officer House says, "okay, here we go, I just explained the whole process to you." Mr. Crump says of Officer Bahaduri, "he probably wanted to shoot the f**** out of me. That's what you wanted to do, wasn't it? You wanted me to make a wrong move so that you could have a reason to blast my black ass." Officer Bahaduri responds, "you pointed hedge trimmers at me. I *could* have shot you." Eventually Officer Bahaduri removes the handcuffs and after a few more minutes of conversation Mr. Crump leaves.

The body camera footage of Officer House begins at the point when Mr. Crump is holding the gardening shears and Officer Bahaduri is telling him to put them down. *See* Downs Ex. C (House body camera footage). Both Officer Bahaduri and Mr. Crump can be seen in Officer House's video footage and the distance between them appears to be roughly 6 to 8 feet. Like the body camera footage from Officer Bahaduri, Officer's House's body camera footage does not capture whether either officer reached for a firearm or a taser; neither officer can be seen pointing a gun or a taser at Mr. Crump.

In his deposition, Officer House testified that he had a specific recollection of drawing his taser from its holster. *See* Johnson Decl., Ex. A (House Dep.) at 24. Further, Defendants stipulated at oral argument that they do not dispute that Officer House drew a taser. There is conflicting evidence, however, as to whether Officer Bahaduri drew a gun. In a statement made to a BART internal affairs officer soon after the incident, Mr. Crump said Officer Bahaduri had had a gun "to [his] head." Downs Decl., Ex. F at 2. However, in the declaration submitted in opposition to summary judgment, Mr. Crump states that he saw Officer Bahaduri draw his gun and point it at the ground in front of Mr. Crump; likewise, in his deposition Mr. Crump testified that he saw Officer Bahaduri draw his gun but could not remember whether the gun was pointed at him or at the ground. Downs Decl., Ex. A (Crump Dep.) at 52-53. Officer Bahaduri testified at his deposition that he believed that he drew his firearm during his encounter with Mr. Crump and held in the "low ready" position, and that he had written as much in his incident report. Declaration of Wayne Johnson in Opposition to Defendants' Motion for Summary Judgment ("Johnson Decl."),

9

Ex. B (Bahaduri Dep.) at 46-47.[10]  He further testified, however, that his attorney had told him prior to the deposition that in fact, he had not drawn his firearm.  *Id.*   When asked why he thought Mr. Crump had "grabbed" the gardening shears, Officer Bahaduri testified that he "believe[d] [Mr. Crump] was trying to show it to [him] . . .  maybe to [make] clear that it wasn't bolt cutters."  *Id.* at 33.

Defendants also submit an expert opinion by Michael Schott, a forensic image analyst. Downs Decl., Ex. H.  Mr. Schott opines based on his review of the body camera footage that while the footage is "inconclusive" as to whether either officer drew his sidearm from its holster at any time during the encounter, it does *not* support the conclusion that a gun was ever pointed at Mr. Crump.  *Id.* at 3.

### B.    Procedural Background

In the First Amended Complaint, which is the operative complaint, Mr. Crump asserts the following claims: 1) 42 U.S.C. § 1983 based on violation of his First Amendment right to be free from retaliation based on his exercise of his right to complain about unfair treatment (Officers Bahaduri and House); 2) 42 U.S.C. § 1983 based on violation of his Fourth Amendment Right to be Free of Unreasonable Seizure and Excessive Force (Officers Bahaduri and House);  3) Battery (Officers Bahaduri and House, BART on theory of vicarious liability); 4) False Imprisonment (Officers Bahaduri and House, BART  on theory of vicarious liability); and 5) Intentional Infliction of Emotional Distress (Officers Bahaduri and House, BART  on theory of vicarious liability).  Mr. Crump seeks compensatory damages and punitive damages as well as an award of attorneys' fees and costs.  He also requests injunctive relief.[11]

In the Motion, Defendants ask the Court to grant summary judgment in their favor on all of Plaintiffs' claims and on his request for punitive damages and injunctive relief.  They contend the First Amendment claim fails because the officers' actions were not motivated by retaliatory

United States District Court
Northern District of California

---

[10] Plaintiff's counsel attached the deposition excerpts of the two officers without assigning exhibit numbers or using exhibit tabs to differentiate between the testimony of the officers.  To avoid confusion, the Court refers to the excerpts of Officer House's deposition as "Exhibit A" and the excerpts of Officer Bahaduri's deposition as "Exhibit B."
[11] The request for injunctive relief appears to be boilerplate language from a different case. At oral argument, Plaintiff stipulated that he is not seeking injunctive relief in this action.

animus based on Mr. Crump's statements but instead, were in response to Mr. Crump's *conduct*. Motion at 7-8. In particular, they contend Mr. Crump's initial refusal to open the second lock in response to Officer Bahaduri's request and his approaching Officer Bahaduri with gardening shears justified the detention, which was unrelated to any statements Mr. Crump made. *Id*. at 8. They also argue there is no evidence that Mr. Crump's speech was chilled or deterred in any way or that his speech was the but-for cause of any injury. *Id*. In the alternative, Defendants contend they are entitled to qualified immunity as to this claim because they did not violate any clearly established First Amendment right. *Id*. at 8-10.

Defendants argue that the Fourth Amendment claims fail because no suspicion is required to initiate contact in a public place. *Id*. at 10. In any event, Defendants argue, there was reasonable suspicion to detain Mr. Crump to conduct a brief investigation as to whether he might be stealing bikes by looking for signs of a cut cable lock and asking Mr. Crump to demonstrate that the bike was his. *Id*. at 10-11. This portion of the detention lasted only two minutes, according to Defendants, and was reasonable as a matter of law. *Id*. at 11. Defendants also argue that Officer House had reasonable suspicion even though he arrived after Officer Bahaduri had initiated contact with Mr. Crump, under the collective knowledge doctrine. *Id*. They further assert that even if the detention was over when Officer Bahaduri said "good night," the subsequent seizure was justified based on Plaintiff's picking up the gardening shears, pointing them at the officers and approaching them while holding the gardening shears, which could be construed as "brandishing" under Penal Code section 417. *Id*. Officer Bahaduri also reasonably believed Mr. Crump had an underlying mental health condition that justified the seizure, Defendants contend. *Id*.

Defendants also argue that Mr. Crump's excessive force claim fails as a matter of law. *Id*. at 12. They point to case authority that handcuffing a suspect is not, by itself, excessive force and that the cases where handcuffing has been found to constitute excessive force have involved situations in which the individuals complained that the officers were hurting them when they put them in handcuffs and the officers ignored the complaints, which did not happen here. *Id*. They also argue that the officers would have been justified in using deadly force because Mr. Crump

was threatening them with a weapon and therefore, handcuffing was reasonable as a matter of law. *Id.* at 13. Finally, Defendants argue that they did not use excessive force because the evidence does not show that the officers drew their guns and pointed them at Mr. Crump. *Id.*

Defendants argue that the battery claim fails for the same reason the excessive force claim fails, namely, there was no unreasonable use of force. *Id.* They argue that they are entitled to summary judgment on the false imprisonment claim because Mr. Crump's detention was reasonable. *Id.* Defendants contend the claim for intentional infliction of emotional distress fails because the video footage shows that the officers' conduct was not outrageous. *Id.* Defendants argue that all of the claims fail as to BART because the officers did nothing that violated the law. *Id.* at ii. Defendants also argue that the Court should strike Mr. Crump's request for punitive damages because BART is immune from punitive damages under federal or state law. Further, as to the officers, Defendants argue that there is no evidence of conduct that would warrant the imposition of punitive damages. *Id.*

## III. ANALYSIS

### A. Legal Standard

#### 1. Rule 56

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Nonetheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary

judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that lower court had erred in denying summary judgment on Fourth Amendment excessive force claim where video footage "quite clearly contradict[ed] the version of the story told by respondent and adopted by the Court of Appeals.").

### 2.  42 U.S.C. § 1983

Section 1983 provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citation omitted)).  Thus, analysis of a civil rights claim brought under § 1983 begins with the identification of the "specific constitutional right allegedly infringed by the challenged application of force."  *Id*. at 394 (citation omitted). The claim is then evaluated under the constitutional standards that apply to that constitutional right.  *Id*. (citing *Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985)).

### 3.  Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity provides government officials with "immunity from suit rather than a mere defense to liability."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis deleted)).  The rule attempts to balance competing interests – those of plaintiffs who have been wronged by government officials, and those of government officials who may be inhibited in performance of their duties out of fear of financial liability and time-consuming litigation.  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

To determine if an official is protected by qualified immunity, a court asks (1) whether the plaintiff's constitutional right has been violated; and (2) whether that right was clearly established at the time of the challenged conduct.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  In *Saucier*, the Supreme Court held that the qualified immunity analysis required that the district court first determine whether there was a violation of the plaintiff's constitutional rights and that only if such a violation was found should it proceed to the question of whether the violation involved a

clearly established right. 533 U.S. at 201. In *Pearson*, however, the Court modified this rule, holding that the qualified immunity analysis need not be done in any particular order. 555 U.S. at 236. The Court reasoned that while the approach required under *Saucier*'s mandate may have a beneficial effect on the development of precedent, "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id*. at 237. Therefore, the Court concluded, a more flexible approach is warranted and will permit the lower courts to "determine the order of decision making that will best facilitate the fair and efficient disposition of each case." *Id*. at 242.

The inquiry as to whether a constitutional right is clearly established is "particularized." *Saucier*, 533 U.S. at 201. It is not enough that the general rule is established. *Id*. Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although the existence of a clearly established constitutional right is usually demonstrated on the basis of cases involving similar facts where the alleged conduct has been found to be unconstitutional, "[w]hen the defendant's conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Deorle v. Rutherford*, 272 F.3d 1272, 1285-1286 (9th Cir. 2001) (quotation and citation omitted). The Supreme Court has cautioned that courts should afford "deference to the judgment of reasonable officers on the scene" and should not use "20/20 hindsight vision." *Saucier*, 533 U.S. at 205. However, "[w]here the facts are disputed, their resolution and determinations of credibility 'are manifestly the province of a jury.'" *Wall v. Cty. of Orange*, 364 F.3d 1107, 1110 (9th Cir. 2004) (quoting *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002)).

### B. Claims

#### 1. Fourth Amendment Claims

Mr. Crump contends his detention was unreasonable because: 1) Officer Bahaduri had no basis for questioning or detaining Mr. Crump when he initially encountered Mr. Crump because

Mr. Crump was doing nothing unlawful; 2) the officers had no basis for seizing Mr. Crump and placing him in handcuffs after Mr. Crump picked up the gardening shears;  3) the officers should have taken the handcuffs off of him sooner; and 4) the manner in which the officers placed him in handcuffs constituted excessive force.

### a. Initial Stop and Detention

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions [or] by putting questions to him if the person is willing to listen . . . ." *Florida v. Royer*, 460 U.S. 491, 497 (1983).  However, the individual "may not be detained even momentarily without reasonable, objective grounds for doing so . . . ." *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544, 556 (1980) (opinion of Stewart, J.)).  Law enforcement can stop and briefly detain a person for investigative purposes only if they have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" even if they lack probable cause under the Fourth Amendment.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1868)).  Reasonable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity."  *United States v. Crapser*, 472 F.3d 1141, 1147 (9th Cir. 2007) (citing *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000)).

Here, it is undisputed that Officer Bahaduri saw Mr. Crump with a bicycle, late at night, in an area where there had been numerous bicycle thefts. It is also apparent from Officer Bahaduri's body camera footage that as he approached Mr. Crump, and before he spoke to Mr. Crump, the gardening shears could be clearly seen as Officer Bahaduri shined his flashlight on the bench near Mr. Crump.  Finally, while Mr. Crump argues strenuously that no reasonable officer could mistake gardening shears for a bolt cutter, Officer Bahaduri's undisputed testimony is that gardening shears, like a bolt cutter, can be used to cut a cable lock.  *See* Downs Decl., Ex. E (Bahaduri Dep.) at 28.  On the other hand, it is also clear from the video footage that Mr. Crump used u-locks on his bike and not cable locks.  Further, Officer Bahaduri testified at his deposition that neither gardening shears nor a bolt cutter can be used to cut a u-lock.  Downs Decl., Ex. E (Bahaduri Dep.) at 28-29.  He also testified that he never found any cable locks that had been cut at any time

1   during or after his encounter with Mr. Crump. *Id*. at 29.

2        Drawing all reasonable inferences in favor of Mr. Crump, a jury could conclude that as

3   soon as Officer Bahaduri approached Mr. Crump and saw no sign of any cable lock that might

4   have been cut with the gardening shears, he did not have even a reasonable suspicion that Mr.

5   Crump might have stolen the bike in his possession, which had obviously been secured by u-locks

6   and not a cable lock. While it is true that Officer Bahaduri was aware of the tool bag on the bench,

7   he conceded at his deposition that at this point in the encounter, he had no idea if it contained any

8   tools. Consequently, the fact that Mr. Crump also had a tool bag with him was not enough to

9   demonstrate (at least, as a matter of law), that he had a particularized suspicion that Mr. Crump

10  had been engaged in illegal activity. Therefore, the Court concludes that there is a material dispute

11  of fact regarding the question of whether Officer Bahaduri violated Mr. Crump's Fourth

12  Amendment rights when he stopped him and required him to demonstrate that he could open both

13  of the u-locks on the bike.

14       Assuming a jury were to find that this initial detention violated Mr. Crump's Fourth

15  Amendment rights, the Court next must decide whether Officer Bahaduri is entitled to qualified

16  immunity because the right was not clearly established. As discussed above, courts must afford

17  some deference to the judgment of officers on the scene in making this determination; moreover, a

18  right should be considered clearly established only if the conduct was "patently violative" of the

19  plaintiff's constitutional rights or there is case law involving similar facts where courts have held

20  that the relevant conduct was unconstitutional. Neither requirement is satisfied here. While the

21  general rule that reasonable suspicion is required to carry out a *Terry* stop is established, Mr.

22  Crump has pointed to no cases involving similar facts to show that a reasonable officer would

23  know that the stop carried out by Officer Bahaduri – including his request that Mr. Crump

24  demonstrate that he owned the bicycle – was a violation of the individual's Fourth Amendment

25  rights.

26       Nor was the conduct of Officer Bahaduri so patently violative of Mr. Crump's rights that it

27  should have been obvious to him that his conduct was unconstitutional. It is apparent from the

28  video that the initial detention lasted only approximately two minutes and ended when Officer

16

Bahaduri said good night and turned away from Mr. Crump.  Further, even though Mr. Crump had to demonstrate more than once that he could open the locks on his bike, the initial detention was relatively non-intrusive.   This is not the sort of egregious conduct that courts have found is an obvious violation of an individual's Fourth Amendment rights. *See, e.g., Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) (holding that where officer shot with a lead bean bag an emotionally disturbed man  who was unarmed and posed little risk of flight or danger to the offices or the public, causing grave injury to the individual, the officer's conduct was so obviously unconstitutional that the constitutional right was well established even though there were no cases involving similar facts holding as much). Therefore, the Court concludes that Officer Bahaduri did not violate a well-established right when he initially stopped Mr. Crump and that he is entitled to qualified immunity on this portion of the claim.[12]

> b.   Seizure of Mr. Crump After He Picked Up Gardening Shears

A "seizure [must] be supported by probable cause when [the] detention rises to the level of an arrest." *See Perce v. Multnomah Cty., Or.*, 76 F.3d 1032, 1040 (9th Cir. 1996).  An arrest or seizure "occurs when a law enforcement officer, through coercion, 'physical force[,] or a show of authority, in some way restricts the liberty of a person.'" *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (quoting *United States v. Chan-Jimenez*, 125 F.3d 1325, 1326 (9th Cir. 1997)).  "Probable cause exists when, 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability' that a crime was committed." *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994) (quoting *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986)).

Defendants contend that when Mr. Crump picked up the gardening shears and took a few steps towards the officers while opening and closing them, they had probable cause to believe Mr. Crump had violated Penal Code section 417, which provides, in relevant part:

> Every person who, except in self-defense, in the presence of any other
> person, draws or exhibits any deadly weapon whatsoever, other than

---

[12] At oral argument, Plaintiff stipulated that to the extent his Fourth Amendment claim is based on the initial investigative stop, which ended when Officer House said "have a good night," he is not asserting that claim against Officer House, who was not present at this point.

> a firearm, in a rude, angry, or threatening manner, or who in any
> manner, unlawfully uses a deadly weapon other than a firearm in any
> fight or quarrel is guilty of a misdemeanor, punishable by
> imprisonment in a county jail for not less than 30 days.

Cal. Pen. Code section 417(a).   Based on the video footage, there is no question that Mr. Crump

"exhibit[ed]" the gardening shears to Officers Bahaduri and House.[13]   Likewise, Mr. Crump

concedes that he was "upset and loud and cursing," *see* Opposition at 7, which can also be seen on

the video footage, supporting probable cause for the "rude [or] angry" requirement of section

417(a).  The remaining question is whether the officers had probable cause to believe the

gardening shears constituted a "deadly weapon."

Although the Court has found no case law that addresses the meaning of "deadly weapon"

in Penal Code section 417(a), the California Supreme Court has addressed the meaning of that

term in Penal Code section 245, which prohibits *assault* with a "deadly weapon," offering the

following guidance:

> As used in section 245, subdivision (a)(1), a "deadly weapon" is "any
> object, instrument, or weapon which is used in such a manner as to be
> capable of producing and likely to produce, death or great bodily
> injury." (*In re Jose D.R.* (1982) 137 Cal.App.3d 269, 275–276, 186
> Cal.Rptr. 898.) Some few objects, such as dirks and blackjacks, have
> been held to be deadly weapons as a matter of law; the ordinary use
> for which they are designed establishes their character as such.
> (*People v. Graham* (1969) 71 Cal.2d 303, 327, 78 Cal.Rptr. 217, 455
> P.2d 153, disapproved on other grounds in *People v. Ray* (1975) 14
> Cal.3d 20, 32, 120 Cal.Rptr. 377, 533 P.2d 1017.) Other objects, while
> not deadly per se, may be used, under certain circumstances, in a
> manner likely to produce death or great bodily injury. In determining
> whether an object not inherently deadly or dangerous is used as such,
> the trier of fact may consider the nature of the object, the manner in
> which it is used, and all other facts relevant to the issue. (*In re Jose
> D.R.*, supra, 137 Cal.App.3d at p. 276, 186 Cal.Rptr. 898; see *People
> v. Nealis* (1991) 283 Cal.Rptr. 376, 232 Cal.App.3d Supp. 1, 4, fn. 2
> [citing California decisions holding various objects, not deadly per se,
> to be deadly weapons under the particular circumstances].)

*People v. Aguilar*, 16 Cal. 4th 1023, 1028–29 (1997).  Thus, for example, in *Estate of Montanez v.*

*City of Indio*, where the plaintiff was holding a pair of scissors, the court noted that "the

determination of whether an object not inherently deadly or dangerous is used as such is a

---

[13] As both Officers House and Bahaduri can be heard in the video footage telling Mr. Crump to
put the shears down and can be seen placing handcuffs on Mr. Crump, the Fourth Amendment
claim applies to both officers as to this portion of the encounter.

question of fact to be determined by a jury or trier of fact." No. 517CV00130ODWSHK, 2018 WL 1989533, at *6 (C.D. Cal. Apr. 25, 2018) (citing *People v. Aguilar*, 16 Cal.4th 1023, 1028–29 (1997)).

Applying these principles to the facts of this case, the Court finds that there is a dispute of fact as to whether a reasonable person would have concluded that Mr. Crump was using the gardening shears as a deadly weapon. Mr. Crump testified that he was showing the officers that he had gardening shears and not a bolt cutter and indeed, Officer Bahaduri testified at his deposition that that is what he thought Mr. Crump was doing when he picked up the gardening shears. A jury could reasonably conclude based on the video footage and the testimony of Mr. Crump and Officer Bahaduri that the officers did not have probable cause to believe that Mr. Crump was using the gardening shears as a deadly weapon, leaving the officers without probable cause for the seizure of Mr. Crump and causing the subsequent detention to be unlawful.

Assuming that the officers violated Mr. Crump's Fourth Amendment rights by seizing him at this point in the encounter, however, it is also clear to the Court that those rights were not clearly established under the facts of this case. It is undisputed (and the video shows) that the gardening shears had long blades that obviously could cause serious injury or death, that Mr. Crump took at least a few steps towards the officers while holding them, and that he was angry and upset. It is also undisputed that only moments before, he had told Officer Bahaduri in a threatening manner that he was going to need back-up. There is no case law involving similar facts suggesting that the officers should have known that detaining Mr. Crump under these circumstances violated his Fourth Amendment rights. Nor is it reasonable to expect that officers encountering situations such as the one here, where a visibly-upset individual is holding a tool that obviously has the potential to inflict serious harm, be familiar with the case law regarding the types of weapons that courts have found to be deadly weapons as a matter of law and the circumstances under which courts have found that objects that are *not* inherently deadly nonetheless satisfy the "deadly weapon" requirement of Penal Code section 417. Therefore, the Court concludes that Officers Bahaduri and House are entitled to qualified immunity on Mr. Crump's Fourth Amendment claim to the extent it is based on the seizure of Mr. Crump after he

United States District Court
Northern District of California

picked up the gardening shears.

### c. Length of the Detention

"[A] detention may be unlawful under the Fourth Amendment 'either because the detention itself is [unreasonable] or because it is carried out in an unreasonable manner.'" *Meredith v. Erath*, 342 F.3d 1057, 1061–62 (9th Cir. 2003) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir.1994)). "The scope of a detention 'must be carefully tailored to its underlying justification.'" *Ganwich v. Knapp*, 319 F.3d 1115, 1122 (9th Cir. 2003) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

Mr. Crump contends the officers kept him in handcuffs for a period that exceeded "the time permitted for any legitimate purpose" because the officers held him in handcuffs and "lectured to [him] after they knew he had not stolen a bicycle or committed any other criminal activity." In other words, under Mr. Crump's theory, this claim turns on whether the officers had probable cause to detain him in the first instance. As discussed above, there are material disputes of fact as to whether the officers had probable cause based on the display by Mr. Crump of the gardening shears, but there is no clearly established right that would have led a reasonable officer to know that that the conduct at issue was unconstitutional. Therefore, the Court concludes that the officers are entitled to qualified immunity on the Fourth Amendment claim based on the length of the detention for the reasons discussed above.

### d. Excessive Force Claims

It is well-established that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396 (U.S. 1989) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Rather, courts ask whether the officers' actions were "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. "In considering an excessive force claim, [courts] balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id*. Determining whether the force used was reasonable "requires careful attention to the facts and circumstances of each particular case, including the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. Of these factors, the Ninth Circuit has held that the most important is "whether the suspect poses an immediate threat to the safety of the officers or others." *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).

Mr. Crump alleges that he was subjected to excessive force because: 1) Officer Bahaduri pointed a gun at him; and 2) the officers subjected him to painful handcuffing. As to the first theory, the evidence is mixed as to whether Officer Bahaduri drew his gun. Drawing all reasonable inferences in favor of Mr. Crump, the Court concludes that a jury could reasonably conclude that Officer Bahaduri drew his gun. On the other hand, no reasonable jury could conclude that a gun was *pointed at* Mr. Crump. In addition to Officer Bahaduri's testimony that he remembers holding his firearm at the "low ready," the opinion of Mr. Schott on this question, and the video footage itself, even Mr. Crump conceded at his deposition that he could not remember whether Officer Bahaduri had pointed a gun at the ground or at him. Moreover, Mr. Crumps testimony at his deposition and his statement to the internal affairs officer that Officer Bahaduri put a gun to his head and that he begged the officer not to shoot him is flatly contradicted by the video footage, which shows no such thing. Thus, that testimony is not sufficient demonstrate a material dispute of fact under *Scott*.

Assuming a jury found that Officer Bahaduri used excessive force by drawing his firearm and pointing at the ground, the Court concludes that he did not violate a clearly established right and therefore, that he is entitled to qualified immunity on this claim.[14] As discussed above, at the point when Officer Bahaduri allegedly drew his gun Mr. Crump had picked up a pair of garden shears and had taken a few steps towards the officer; Mr. Crump was also visibly upset and had told Officer Bahaduri a few minutes before that he was going to need back-up. Plaintiff has pointed to no case law involving similar facts suggesting that Officer Bahaduri should have known that drawing his gun and holding it in a low ready position violated Mr. Crump's Fourth

---

[14] To the extent Mr. Crump's excessive force claim is based on Officer House's drawing of his taser, the same reasoning applies to that claim as to Officer Bahaduri's drawing of his firearm.

Amendment right to be free from excessive force. Nor is this the sort of egregious violation that would make it obvious that this conduct constituted a violation of Mr. Crump's constitutional rights.

Similarly, with respect to the allegation of painful handcuffing, the Court finds that while there may be material factual disputes as to whether the officers used excessive force, they are entitled to qualified immunity. "[H]andcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention." *United States v. Bautista,* 684 F.2d 1286, 1289 (9th Cir. 1982). Thus, in the absence of probable cause, courts look to whether officers reasonably believed an individual was likely to flee or presented a danger to the officers or the public in determining whether the use of handcuffs was reasonable. *Id.* On the other hand, courts typically find that the initial decision to place an individual in handcuffs is reasonable if there is probable cause to believe a crime has been committed. *See, e.g., Davis v. Cty. of San Bernardino,* No. EDCV 08-1262SVWSSX, 2009 WL 3838287, at *8 (C.D. Cal. Nov. 13, 2009), aff'd, 442 F. App'x 300 (9th Cir. 2011) (finding that initial decision to place plaintiff in handcuffs did not violate Fourth Amendment based, in part, on finding that there was probable cause). Nonetheless, "abusive application of handcuffs" may violate the Fourth Amendment even if there is probable cause. *Palmer v. Sanderson,* 9 F.3d 1433, 1436 (9th Cir. 1993); *see also Wall v. Cnty. of Orange,* 364 F.3d 1107, 1112 (9th Cir. 2004) ("overly tight handcuffing can constitute excessive force.").

Mr. Crump contends "one can see from the close ups of the video that the officers placed Mr. Crump in a form of thumb and or wrist lock and forced his arms above his shoulders, tearing his rotator cuffs." Opposition at 9; *see also* Crump Decl. ¶ 46 ("I learned later that the officers had used so much force that they tore my rotator cuffs, and I had to have surgery to repair both sides."). Although Mr. Crump has not offered any medical evidence that his rotator cuffs were torn neither have Defendants offered conflicting evidence that they were not torn (or that it was not because of the handcuffing). If Mr. Crump's statement that his rotator cuffs were torn as a result of the handcuffing is admissible there is a material dispute of fact as to whether the handcuffing constituted excessive force. The Court does not reach that question, though, because it finds that under the specific circumstances of this case, Mr. Crump's right to be free from

excessive force was not well-established.

"The Ninth Circuit has allowed excessive force claims based on handcuffing to proceed to the jury where repeated requests to loosen the handcuffs were ignored and the plaintiff suffered some injury." *Chambers v. Steiger*, No. C14-1678-JCC-MAT, 2015 WL 9872531, at *7 (W.D. Wash. Oct. 29, 2015), report and recommendation adopted, No. C14-1678-JCC, 2016 WL 235764 (W.D. Wash. Jan. 20, 2016) (citation omitted); *see also Malek v. Green*, No. 17-CV-00263-BLF, 2017 WL 4284117, at *18 (N.D. Cal. Sept. 27, 2017) (holding that officers were entitled to qualified immunity as to claim based on painful handcuffing where there were no allegations of abnormal handcuffing procedure, visible manifestations of the plaintiff's pre-existing injury that allegedly made handcuffing painful, or "even a request by [the plaintiff] to the Officers to loosen or remove the handcuffs"). In *Malek*, the court found that there was no clearly established right as to the handcuffing based on the Ninth Circuit's decision in *Walls* because in that case the plaintiff had repeatedly complained to the officers that the handcuffs were too tight and they ignored him; there was also evidence that he suffered nerve damage from the handcuffing and had to give up his profession as a dentist as a result. 2017 WL 4284117, at *18 (citing *Walls*, 364 F.3d at 1110-1112)).

Here, there is some evidence of injury but there is no evidence that Mr. Crump complained to the officers, either while the officers placed the handcuffs on him or during the period that followed, when Mr. Crump continued to converse with the officers while sitting on a bench in handcuffs. Instead, the video footage shows that he never alerted the officers that they were hurting him or that the handcuffs were causing him pain. Even assuming that the officers' manner of placing Mr. Crump in handcuffs caused him injury, the Court has found no case law demonstrating that they violated well-established constitutional rights where Mr. Crump did not complain and there was no other circumstance that would have made it apparent to the officers that they were causing him pain or injury. As in *Malek*, this court finds that the facts here are distinguishable from *Walls* and therefore, that case is not sufficient to show that the officers violated a clearly established right. Accordingly, the Court concludes the officers are entitled to qualified immunity on Mr. Crump's claim that he was subjected to excessive force in violation of

the Fourth Amendment.

For these reasons the Court GRANTS the Motion as to Mr. Crump's Fourth Amendment claims.

### 2. First Amendment Retaliation Claim

To demonstrate retaliation in violation of the First Amendment, a plaintiff must prove that the defendant "took action that 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Skoog v. Cty. of Clackamas*, 469 F.3d 1221, 1231–32 (9th Cir. 2006) (quoting *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)). In addition, the plaintiff must show that the "desire to cause the chilling effect was a but-for cause of the defendant's action." *Id.* In *Skoog*, the Ninth Circuit found that even where the defendant's conduct is supported by probable cause a plaintiff may be able to establish a violation of his or her First Amendment rights. *Id.* at 1234-1235. Thus, for example, in *Ford v. City of Yakima*, the court found that there was sufficient evidence to survive summary judgment on a First Amendment retaliation claim where the plaintiff was arrested for violating a noise ordinance following a vehicle stop even though there may have been probable cause for the arrest. 706 F.3d 1188, 1193-1195 (9th Cir. 2013).

In *Ford*, the plaintiff emerged from the car yelling and although he complied with the officer's order to produce his license and registration he told the officer he thought the stop was racially motivated as he did so. *Id.* at 1190. The officer, in turn, made a number of statements indicating that his decision to take the plaintiff to jail rather than simply issuing a citation was based on the plaintiff's statements. *Id.* Among the officer's statements were the following: "(1) 'Stop running the mouth and listen'; (2) 'If you talk over me, you are going to go to jail, sir. Do not talk over me'; (3) 'If you cooperate, I may let you go with a ticket today. If you run your mouth, I will book you in jail for it. Yes, I will, and I will tow your car'; (4) 'If you cooperate and shut your mouth, I'll give you a ticket and you can go.'" *Id.* at 1190-1191. Later, the officer said to the plaintiff:

> You're going to jail for numerous reasons. The crime you're going to jail for is the city noise ordinance. A lot of times we tend to cite and release people for that or we give warnings. However ... you acted a

> fool ... and we have discretion whether we can book or release you. You talked yourself—your mouth and your attitude talked you into jail. Yes, it did.

*Id.* at 1191. The Ninth Circuit reversed the district court's award of summary judgment in favor of defendants on the plaintiff's First Amendment retaliation claim, finding that there was sufficient evidence for a jury to find that the defendants' actions would have a chilling effect on the plaintiff's speech and that the defendant's actions were caused by retaliatory animus. *Id.* at 1193-1195.

The court in *Ford* also found that the officer was not protected by qualified immunity because the First Amendment right in that case was well-established. *Id.* at 1195. The court pointed to a 1990 decision, *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372 (9th Cir. 1990), in support of its conclusion. *Id.* In that case, the Ninth Circuit held that a traffic stop motivated by obscene gestures by occupants of the car without any legitimate reason for the stop would constitute a "serious First Amendment violation." 904 F.2d at 1378. The *Ford* court went on to point to the Ninth Circuit's decision in *Skoog*, in which it held that there may be a violation of an individual's First Amendment rights even where there was probable cause to support the officer's conduct. *Ford*, 706 F.3d at 1196. Based on this case law, the court in *Ford* concluded that the First Amendment right in that case was clearly established. *Id.* ("Thus, *Duran* clearly established that police officers may not use their authority to punish an individual for exercising his First Amendment rights, while *Skoog* clearly established that a police action motivated by retaliatory animus was unlawful, even if probable cause existed for that action."). Consequently, the court found that the officer in *Ford* was not entitled to qualified immunity. *Id.*

The evidence in this case on Mr. Crump's First Amendment retaliation claim is sufficient to survive summary judgment because a jury could reasonably conclude that both the chilling effect and the causation requirements are satisfied. As to the first requirement, Plaintiff has pointed to evidence of conduct which a jury could conclude would chill his exercise of First Amendment rights, namely, detaining him, using excessive force in placing him in handcuffs, and prolonging the detention when there was no legitimate reason to do so. He has also offered evidence of retaliatory animus. First, the video shows that Mr. Crump cursed at Officer Bahaduri

numerous times after he was stopped and that he was detained and placed in handcuffs immediately after telling Officer Bahaduri to have a "f***** up night." While Defendants contend they were reacting to Mr. Crump's conduct and not his statements, that is a question more appropriately decided by a jury. Second, there is some evidence that the officers' conduct with respect to Mr. Crump's detention was based on Mr. Crump's statements and not for a legitimate reason. In particular, one of the officer in this case (as in *Ford*) told Mr. Crump as he sat in handcuffs, "it's your *attitude*." This statement was made after Mr. Crump complained that the officers' actions were racially motivated and had called one of the officers a "jackass." Based on this evidence, the Court concludes that Mr. Crump's First Amendment retaliation claim is supported by sufficient evidence to survive summary judgment.

The Court further concludes that the officers are not entitled to qualified immunity on this claim. As the court in *Duran* and *Skoog* found, it is well-established that retaliatory arrest and retaliatory search and seizure by a law enforcement officer violate an individual's First Amendment rights. Thus, to the extent a jury finds that the officers in this case detained Mr. Crump or used excessive force against him because of Mr. Crump's protected statements, the officers are not entitled to qualified immunity on this claim. Therefore, the Court DENIES the Motion as to Mr. Crump's First Amendment Retaliation claim.

### 3. State Law Claims

#### a. Battery

Defendants contend they are entitled to summary judgment on the battery claim because there was no excessive force, as a matter of law. Because the Court finds that there are material disputes of fact with respect to whether the officers used excessive force Defendants' challenge to the battery claim also fails. Therefore, the Motion is DENIED as to the battery claim.

#### b. False Imprisonment

Defendants argue that they are entitled to summary judgment on the false imprisonment claim because the underlying detention was valid. Again, the Court has found that there are material disputes of fact on this issue and therefore, that Defendants' challenge to the false imprisonment claim also fails. Therefore, the Motion is DENIED as to the false imprisonment

1    claim.

2           c.  Intentional Infliction of Emotional Distress

3         Defendants contend there is no evidence that the officer's conduct was "outrageous" and

4    therefore, the claim for intentional infliction of emotional distress should be dismissed.  If the jury

5    should find that the officers used excessive force against Mr. Crump, or detained him longer than

6    necessary in retaliation for Mr. Crump's complaints (including his complaints that he was being

7    wrongfully detained and that the detention was racially motivated), the Court cannot say, as a

8    matter of law, that the conduct of the officers was not outrageous.  Rather, that is a question that is

9    more appropriately decided by a jury.

10          **4.  Punitive Damages**

11        Defendants contend BART is immune from punitive damages under 42 U.S.C. § 1983 and

12   from punitive state law under California Government Code § 818.  Motion at 14 (citing *City of*

13   *Newport v. Fact Concerts, Inc*. 453 U.S. 247, 271 (1981)).   Defendants are correct.  At oral

14   argument, Mr. Crump's counsel stipulated that he is seeking punitive damages only as to the

15   individual defendants.

16        With respect to the individual BART officers, Defendants argue that the request for

17   punitive damages should be stricken because the officers did not engage in conduct that would

18   warrant an award of punitive damages under *Smith v. Wade*, 461 U.S. 30 (1983).  In that case, the

19   Court held that "a jury may be permitted to assess punitive damages in an action under § 1983

20   when the defendant's conduct is shown to be motivated by evil motive or intent, or when it

21   involves reckless or callous indifference to the federally protected rights of others." 461 U.S. at

22   56.  Similarly, under California law, punitive damages may be appropriate "where it is proven by

23   clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."

24   Cal. Civ. Code § 3294.  The Court concludes that the question of whether this standard is met is

25   more appropriately decided by a jury and therefore denies Defendants' request to strike the prayer

26   for punitive damages as to the individual officers named as defendants in this case.

27   **IV.    CONCLUSION**

28        For the reasons stated above, the Motion is GRANTED as to all of Mr. Crump's Fourth

Amendment Claims, which are dismissed with prejudice.  The Court DENIES the Motion in all other respects.  **In addition, the Court modifies the deadlines for filing and exchanging pretrial materials set forth in Section V of its pretrial order, Docket No. 41.  In particular, the materials described in Section V that are to be filed 30 days before the January 25, 2019 pretrial conference will instead be due 45 days before the pretrial conference, that is, on December 11, 2018.  Materials that are to be filed 20 days before the pretrial conference under Section V will be due 35 days before the pretrial conference, that is, on December 21, 2018.**  Finally, the parties are cautioned to adhere strictly to the specific instructions in the pretrial order;  **any pretrial materials that do not comply with the instructions in the pretrial order may be stricken.**

**IT IS SO ORDERED.**

Dated: October 10, 2018

_____
JOSEPH C. SPERO
Chief Magistrate Judge